UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No: 2:14-cr-13-FtM-29DNF

KEVIN CHARLES KASZYNSKI
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

### I.     Introduction

This cause is before the Court on Defendant Kevin Charles Kaszynski's Motion to Suppress (Doc. 32) filed on May 29, 2014. The Government filed a Response to Defendant's Motion to Suppress (Doc. 36) on June 12, 2014. Defendant is charged with knowingly possessing one or more matter(s) which contain a visual depiction that had been transported in interstate and foreign commerce, and which had been produced using materials which had been transported, by any means including by computer, where the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct, and such visual depiction is of such conduct in violation of 18 U.S.C. § 2252(a)(4)(B) and 2252(b)(2). (Doc. 14). This matter was referred to the Court for a report and recommendation and an evidentiary hearing was held before the undersigned on July 23, 2014. A Transcript (Doc. 59) of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number) was filed on September 17, 2014. Defendant is requesting the Court to suppress: (1) all evidence obtained as a result of the warrantless search of the Defendant's hard drive on September 3, 2014; (2) all evidence obtained as a result of the search warrant issued for the same hard drive; and (3) all evidence obtained as a result of the

search warrant issued for Defendant's E-machine computer.  For the reasons explained below, the Court recommends that Defendant's motion be **DENIED**.

### II.    Evidence

The Government presented the testimony of four witnesses: Laura Kaszynski, Renee Nordean, Detective Richard Meeks of the Fort Myers Police Department, and Agent Keith Cramsey of the Department of Homeland Security.  Defendant presented the testimony of one witness, Alan Nelson.  The Court will summarize the testimony of each witness below.

### A.  Testimony of Laura Kaszynski

Laura Ann Kaszynski testified as follows.  Ms. Kaszynski is employed by Chico's and lives in Lee County, Florida. (Tr. 6).  She is the estranged wife of Defendant, whom she was married to for 20 years. (Tr. 6).  They separated on June 22, 2013, the date Defendant moved out of the marital home. (Tr. 7).

Ms. Kaszynski and Defendant rented a storage unit during their marriage. (Tr. 8).  During the last week of June 2013, Defendant removed his name from the storage unit and asked Ms. Kaszynski to take over the contract with the storage unit company, which she did. (Tr. 8-9).  Previously, Ms. Kaszynski and Defendant both had access to the storage unit.  Defendant routinely visited the storage unit where they kept the family's holiday decorations. (Tr. 8).  After solely taking responsibility for the storage unit contract, Ms. Kaszynski changed the locks. (Tr. 9).

On June 30, 2013, Defendant returned to stay at the marital home while Ms. Kaszynski and her son went on vacation. (Tr. 10).  The purpose of this arrangement was to save money as Defendant had been living in a hotel since the separation and so that he could take care of the household animals. (Tr. 10).  Ms. Kaszynski's understanding was that Defendant would stay at

the home until July 14, but would leave before Ms. Kaszynski and her son arrived back from their vacation. (Tr. 10).  While on vacation Ms. Kaszynski was contacted about Defendant's health and returned home early on July 11, 2013. (Tr. 11).  When she returned home she found her house in disarray, with mold, dirty clothes, and feces from the household animals strewn about within. (Tr. 11).  Defendant's belongings were still in the house at that time. (Tr. 11).  His main computer, a desktop eMachine, was set up on the dining room table. (Tr. 12).  Before he had moved out, Defendant kept his eMachine set up in his home office area which was located in the garage. (Tr. 12).  Defendant had brought back the eMachine when he stayed at the house while Ms. Kaszynski was on vacation. (Tr. 12).  Ms. Kaszynski picked up Defendant's belongings, except the eMachine, and placed them in bags and boxes and put them into the garage. (Tr. 13).  She later took these items to the storage unit. (Tr. 13).  Ms. Kaszynski kept the white eMachine at her home because she needed it to pay bills. (Tr. 13).  She was unable to gain access to the computer due to it requiring a password to log in. (Tr. 13).  She never used this computer before as Defendant had exclusive access to it. (Tr. 14).  Once she learned she could not gain access to the computer, she placed in a large box and took it to the storage unit. (Tr. 14).

On or about August 1, 2013, Defendant gave Ms. Kaszynski a handwritten list of items that he would like to be returned to him at his parents' residence where he planned to live upon his release from rehabilitation. (Tr. 14-15).  On August 9, 2013, Ms. Kaszynski collected the items from the house and then went to the storage unit to retrieve some items requested by Defendant which she had taken there from the house when she was cleaning up after the vacation. (Tr. 16).  While retrieving the items requested by Defendant, Ms. Kaszynski noticed some boxes in the storage unit that she had never seen before and which she knew did not contain holiday

decorations. (Tr. 17).   She removed the eMachine and took it, along with other items, to Defendant's mother. (Tr. 17-18).

Ms. Kaszynski returned to the storage unit around August 10, 2013, and brought some of the boxes from the storage unit home with her to start sorting through them. (Tr. 18-19).  She found years of credit card bill statements in Defendant's name and desk trinkets she had given Defendant in the box. (Tr. 19).   She also found an item that she described as a heavy black box, which appeared to have some type of fan inside. (Tr. 19).   At the time, she did not know that the black box was actually an external hard drive. (Tr. 19).   She did not know what the black box was until a day later when her friend and co-worker, Renee Nordean, came to her house and told her it was an external hard drive. (Tr. 20).  Ms. Kaszynski became worried that it was something she should have taken to her husband, as his handwritten note had requested hard drives. (Tr. 20).  Ms. Kaszynski brought the hard drive along with her when she visited her divorce attorney with whom she already had a standing appointment. (Tr. 21).   Her divorce attorney advised her to try to gain access to the external hard drive to locate a missing tax file that was needed to complete a financial affidavit for the divorce. (Tr. 23).   She purchased a power cord from Amazon.com with the help of another friend, Heidi Torock to gain access to the hard drive. (Tr. 22).

On August 27, 2013, Ms. Kaszynski attempted to gain access to the hard drive at her work computer at Chico's.  Ms. Nordean, and Ms. Torock were present when Ms. Kaszynski attempted to access the hard drive. (Tr. 22-23).  Ms. Nordean operated the computer mouse. (Tr. 24).  After plugging in and turning on the hard drive, the hard drive's directory opened on the screen. (Tr. 24). The women were able to see names of the files on the hard drive. (Tr. 24). One name that stood out to Ms. Kaszynski was a file entitled "kitty kitty meow meow." (Tr. 24).  The women

made a decision to click on a file that did not have any words in its title. (Tr. 26).  Ms. Nordean opened a file containing an image of a young girl, around the age of ten in what Ms. Kaszynski descried as a sexually explicit pose. (Tr. 27).  The girl in the image was wearing a bright neon yellow top with bright pink panty hose. (Tr. 27).  The girl was holding her legs or knees up towards the top of her shoulders and the image focuses on her vagina and anal area. (Tr. 27).  Ms. Kaszynski described the pose as hard and nasty, and noted that the girl was wearing heavy make-up. (Tr. 27).  Ms. Kaszynski testified that upon seeing the image, she fell back into her chair and started hyperventilating. (Tr. 28).

The women did not look at any other photos. (Tr. 28).  While Ms. Kaszynski was trying to regain her composure, Ms. Nordean unplugged and repacked the hard drive. (Tr. 28).  A few minutes later, Ms. Kaszynski contacted her divorce attorney who advised her to come to his office with the hard drive. (Tr. 29). Ms. Kaszynski and Ms. Nordean then took the hard drive to the divorce attorney. (Tr. 29).  The hard drive was left untouched in the grocery bag used to store it. (Tr. 29).  The divorce attorney contacted law enforcement, who came and took custody of the hard drive. (Tr. 30).

On September 3, 2013, law enforcement brought the hard drive to Chico's, Ms. Kaszynski's workplace, and requested the women to recreate what had occurred on August 27, 2013.  (Tr. 30).  Present at Ms. Kaszynski's cubicle were Ms. Nordean, Ms. Torock, Detective Meeks, Agent Cramsey, Ms. Kaszynski's attorney, and Chico's loss prevention and IT security employee. (Tr. 31).  The women connected the hard drive to Ms. Kaszynski's work computer and plugged in the power cord. (Tr. 31).  Ms. Nordean controlled the mouse. (Tr. 31). Law enforcement asked the women to show them the same image that they had previously opened. (Tr. 31).  Ms. Nordean located the file and clicked on it. (Tr. 32).  The file contained the same

exact image that the woman had seen on August 27, 2013. (Tr. 32).  The women did not click on any other file. (Tr. 32).  Law enforcement looked at the names of the files in the directory but did not have any contact with the computer or control the mouse. (Tr. 33).  The reenactment lasted approximately 12 to 15 minutes. (Tr. 36).  After law enforcement was finished, the hard drive was unplugged and taken back into custody. (Tr. 33).

Ms. Kaszynski subsequently provided additional information to law enforcement regarding Defendant's eMachine computer. (Tr. 35).  Ms. Kaszynski told law enforcement that the eMachine had been taken to Defendant's mother's house. (Tr. 35).

On cross examination, Ms. Kaszynski testified as follows.  She, and not Defendant, filed for divorce. (Tr. 37).  As part of the divorce proceeding she is attempting to have the parental rights of Defendant terminated with respect to the two children they adopted together in 2011. (Tr. 37).  In support of her argument that Defendant's parental rights should be terminated, she has raised the claim that he is charged in federal court with possession of child pornography. (Tr. 38-39).

Ms. Kaszynski testified that she had taken out a domestic violence injunction against Defendant in July 2013. (Tr. 39-40).  In her petition for the injunction, Ms. Kaszynski accused Defendant of misconduct going back to 2003 and that Defendant has been an alcoholic for a number of years. (Tr. 40).  Ms. Kaszynski testified that she had previously thought Defendant was a fit and proper parent when she was attempting to adopt children with him in 2011. (Tr. 40-41).  Ms. Kaszynski testified that she did not allege any misconduct on Defendant's behalf during the adoption proceedings, but had suspicions about Defendant's alcoholism and some type of sexual misconduct in 2003. (Tr. 42-43).   Ms. Kaszynski testified that she had a suspicion that Defendant was an alcoholic prior to 2011 and that Defendant admitted to being one in 2013.  (Tr.

41).  Ms. Kaszynski denied withholding information from state authorities because it was in her interest during the adoption proceedings. (Tr. 44).  Ms. Kaszynski testified that on the day before the present hearing, she attended a proceeding in state court in which she sought to relocate with her children. (Tr. 45-46).  Ms. Kaszynski pointed out at the state court proceeding motion that Defendant was currently incarcerated by federal authorities on charges of child pornography. (Tr. 46).

Ms. Kaszynski testified that she found the hard drive among Defendant's personal effects in the storage unit. (Tr. 47).  She testified that she attempted to gain access to the hard drive in order to locate her shared joint tax return from 2012. (Tr. 49).  She testified that she originally told law enforcement that she attempted to gain access to the hard drive for three reasons.  First, she was worried that the hard drive was something that her husband specifically said he wanted back. (Tr. 50).  Second, she wanted to find any information that would explain Defendant's recent and increasing strange behavior. (Tr. 51).  She testified that the search was to find information that could be used against Defendant in the divorce. (Tr. 51).  Third, she hoped to locate family financial information. (Tr. 51).

Ms. Kaszynski testified that when the hard drive was plugged in and attached to the computer, a root directory came on to the computer screen. (Tr. 53).  Ms. Kaszynski testified that the Government's Exhibit 7 was the same root directory she saw on August 27, 2013, but it may have displayed differently. (Tr. 55).  Ms. Kaszynski testified that the women opened only one file on August 27, 2013. (Tr. 57).  Ms. Kaszynski testified that she viewed the image on August 27, 2013, for more than a few seconds, but less than two minutes. (Tr. 58).  Ms. Kaszynski testified that when she told Agent Cramsey about the picture on August 27, 2013, she could not recall whether the vagina was exposed and visible through the clothes. (Tr. 59).

Ms. Kaszynski testified that the image she saw on September 3, 2013, was the same as the image she saw on August 27, 2013. (Tr. 61).  Ms. Kaszynski testified that she did not write down the name of the file opened on August 27, 2013, and neither did her co-workers. (Tr. 61). The file they opened contained the letters "IMG" in its file name and was a .JPG file. (Tr. 62). Ms. Kaszynski testified that there are two .JPG files with the letters "IMG" listed in the hard drive's directory. (Tr. 62).  Ms. Kaszynski testified that the hard drive was plugged into her computer for a longer period of time on September 3, 2013 than on August 27, 2013. (Tr. 62).

Ms. Kaszynski testified that Defendant could not have had access to the eMachine computer while he was in patient treatment in July 2013. (Tr. 65).  Ms. Kaszynski testified that Defendant could have accessed the eMachine computer after he was released from treatment on August 9, 2013, but before he was arrested on September 2, 2013 for violating the domestic violence injunction. (Tr. 66).  Ms. Kaszynski testified that Defendant has been in custody since his arrest on September 2, 2013 and has not had access to the eMachine since. (Tr. 66).

**B.  Testimony of Renee Nordean**

Ms. Nordean testified as follows.  She is an employee at Chico's and is a co-worker and friend of Ms. Kaszynski. (Tr. 75).  In August of 2013, while visiting Ms. Kaszynski, Ms. Nordean saw the hard drive on Ms. Kaszynski's kitchen table. (Tr. 76).  She had come to the home to give Ms. Kaszynski a spare computer that she had. (Tr. 76).  She explained to Ms. Kaszynski what it was, because Ms. Kaszynski did not know at the time that it was a hard drive. (Tr. 77).  Ms. Nordean offered to assist Ms. Kaszynski with accessing the hard drive. (Tr. 77).  Ms. Nordean, Ms. Kaszynski, and Ms. Torock researched the cables that the hard drive needed and then purchased them off Amazon.com. (Tr. 78).

When the power cable arrived in the mail, the women hooked up the hard drive to Ms. Kaszynski's work computer. (Tr. 79).  The woman did this at approximately 8:00-8:30 am at Chico's office on August 27, 2013. (Tr. 79-80).  Ms. Nordean connected all the wires. (Tr. 80).  Ms. Nordean, who was controlling the mouse, clicked on the hard drive's icon and the main directory came open. (Tr. 81).  When the directory opened up there were a few file folders on the left side, and there were just random image and video folders on the right side. (Tr. 81).  Ms. Nordean identified the Government's Exhibit 7 as the file directory that she saw on August 27, 2013.

Some of the file names seemed strange to the women. (Tr. 82).  They opened a single file which contained a photograph of a young girl with blonde hair wearing a neon yellow shirt and neon pink tights laying back on what appeared to be pillows exposing herself. (Tr. 83).  Ms. Nordean testified that the pose was unnatural and the focal point of the photograph was the girl's private area. (Tr. 83).  Ms. Nordean testified that she thought the girl was under the age of 14. (Tr. 84).  After seeing the image, Ms. Nordean immediately closed the file and ripped the cables out of the work computer and disconnected the hard drive. (Tr. 84).  The image of the girl was the only file opened. (Tr. 84).  The women placed the hard drive in a plastic bag and took it to Ms. Kaszynski's divorce attorney. (Tr. 84-85).  The hard drive was later turned over to law enforcement the same day. (Tr. 85).

On September 3, 2013, Ms. Nordean attempted to recreate for law enforcement what had occurred on August 27, 2013. (Tr. 85).  Present at Ms. Kaszynski's cubicle was Ms. Kaszynski, Ms. Torock, Detective Meeks, Agent Cramsey, and Chico's security officer. (Tr. 86).  Ms. Nordean plugged in the hard drives power cable and connected it to Ms. Kaszynski's computer. (Tr. 86).  She then opened up the root directory and then opened the same file that she had

previously opened on August 27, 2013. (Tr. 86).  She did not see Agent Cramsey or Detective Meeks access any other file. (Tr. 90).

On cross examination, Ms. Nordean testified that she was a confidant to Ms. Kaszynski and was aware of what was going on in her divorce proceedings. (Tr. 91-92).  Ms. Nordean testified that she has met with Ms. Kaszynski's divorce attorney and criminal attorney a single time each, with Agent Cramsey four times, and twice with Detective Meeks. (Tr. 92-93).  She testified that she found a business card in her door from the Federal Public Defenders office, but did not call the number on the card. (Tr. 94).

Ms. Nordean testified that the Government's Exhibit 7 was the directory she saw on August 27, 2013, and that the directory contained significantly more than 40 files. (Tr. 98-99).  Ms. Nordean testified that there are two files listed in the hard drive directory that have the letters "IMG" in their file name, "IMG_9278.JPG" and "IMG_9320.JPG". (Tr. 100).  Ms. Nordean did not write down the file name of the file she opened on August 27, 2013 or on September 3, 2013. (Tr. 100).  Ms. Nordean testified that the hard drive's root directory displayed the same on Ms. Kaszynski's computer on August 27, 2013 and September 3, 2013, but looked slightly different than in the Government's Exhibit 7 due to it being displayed on a different computer screen. (Tr. 100).  Ms. Nordean testified that although she did not write down the file name of the file she opened on August 27, 2013, she knew where it was located on the screen and opened the exact file on September 3, 2013. (Tr. 107).

Ms. Nordean testified the directory remained on screen on September 3, 2013 for approximately 15 to 20 minutes. (Tr. 108).  Ms. Nordean testified that at some point she surrendered the controls to Detective Meeks, who then operated the controls for approximately 15 to 20 minutes. (Tr. 108).  Ms. Nordean testified that she stayed and watched the whole time

and that Detective Meeks never opened any of the files, but only examined the contents of the root directory. (Tr. 109).

### C.  Testimony of Detective Richard Meeks

Detective Meeks testified as follows.  He is a detective with the Fort Myers Police Department and is assigned to the special investigations group. (Tr. 114).  He has received training through the Secret Service National Forensics Academy and certifications in EnCase, FDK forensics, and cell phone forensics. (Tr. 114). He is routinely involved in forensic analysis for Fort Myers Police Department. (Tr. 114).

On August 27, 2014, DM was contacted by Agent Cramsey to meet him at his office downtown. (Tr. 115).  The hard drive was turned over to Detective Meeks at this time. (Tr. 115). While the hard drive was in the custody of the Fort Myers Police Department, one of the evidence custodians dropped it and part of the hard drives plastic shell cracked. (Tr. 116).  It was taped back together. (Tr. 116).

On September 3, 2013, Detective Meeks was asked by Agent Cramsey to bring the hard drive to Chico's. (Tr. 116-117).  The hard drive had been stored at the Fort Myers Police Department between August 27, 2013 and September 3, 2013. (Tr. 116).  The purpose of bringing the hard drive to Chico's was so that the women could show him and Agent Cramsey what they saw that they believed to be child pornography. (Tr. 117).  Detective Meeks placed tape on the hard drive to hold back its case so that the women could plug the power cord into it. (Tr. 117-118).   He did not connect the hard drive to the computer himself. (Tr. 118).  After the woman plugged in the hard drive a prompt came up asking the user what the user wanted to do to the drive. (Tr. 118).  The women clicked on "open" so that they could see what was on the drive. (Tr. 118).  The women navigated to a specific file and opened it. (Tr. 118).  No direction was

given by law enforcement as to what to do on the computer. (Tr. 118).  This was the first time Detective Meeks had seen the contents of the external hard drive. (Tr. 119).

Detective Meeks testified that there were several files visible on the root directory that had titles consistent with child pornography file names. (Tr. 120).  Detective Meeks and Agent Cramsey never asked the women to open any of those files. (Tr. 120).  He did not see anyone else open a file that day. (Tr. 120).  Detective Meeks testified that one of Ms. Kaszynski's associates operated the controls of the computer. (Tr. 120).  Detective Meeks testified that the women accessed the file named "IMG_9278.JPG" and no other image was opened on September 3, 2013. (Tr. 122).

Detective Meeks testified that he started the imaging of the hard drive on September 6, 2013, one day after the search warrant was issued. (Tr. 123).  No one else accessed the computer from September 3, 2013, until the day that he imaged the drive. (Tr. 123).  Detective Meeks testified that the file named "IMG_9320.JPG" contains a picture of the same girl that is depicted in "IMG_9278.JPG", and that the two images are possibly part of a series. (Tr. 124).  Detective Meeks testified that the position the girl is laying is different in each image. (Tr. 124).  Additionally, Detective Meeks found approximately 7,000 images and approximately 400 videos of child pornography on the hard drive. (Tr. 125-126).  Detective Meeks testified that the primary purpose for the external hard drive was to download, image, and hold images of child pornography. (Tr. 126).  Detective Meeks found 300 images and approximately 18 videos of child pornography stored on the eMachine. (Tr. 128).

On cross examination, Detective Meeks testified that to his recollection, he never took the controls of the computer. (Tr. 129).  Detective Meeks testified that the log he provided to the Federal Public Defenders shows that the files titled "IMG_9278.JPG", "IMG_9320.JPG", and

two other files were accessed on September 3, 2013. (Tr. 132). Detective Meeks testified that Defendant's Exhibit E was a log of the picture and video files accessed on August 27 and September 3, and Exhibit D was a log of all files accessed on August 27 and September 3. (Tr. 133). Detective Meeks testified that he started the imaging of the hard drive located inside the eMachine computer on January 30, 2014, after the issuance of a search warrant. (Tr. 137).

On redirect examination, Detective Meeks testified that there is a distinction between accessing a file and actually opening a file. (Tr. 137). Detective Meeks testified that files can be accessed without being opened. (Tr. 137). Detective Meeks testified that a virus software program can change a file's accessed date and hovering a mouse cursor over a file can change the accessed date. (Tr. 137). Detective Meeks testified that law enforcement could not go back and check the computer at Chico's to find out when the images were accessed because the computer's memory was wiped after September 3, 2013 viewing. (Tr. 138).

On recross examination, Detective Meeks testified that he could locate no literature providing that a file's date accessed can change by hovering over it with a mouse cursor. (Tr. 139). Detective Meeks testified that he has observed the occurrence, but did not document it. (Tr. 140).

### D.  Testimony of Agent Keith Cramsey

Agent Cramsey testified as follows. He is employed as an agent with the Department of Homeland Security and is assigned to the Fort Myers office. (Tr. 142-143). As an agent he investigates all crimes that fall within the jurisdiction of the Department of Homeland Security, which typically involves transnational investigations or investigations that have a nexus to international borders. (Tr. 143). Most of Agent Cramsey's experience is in child exploitation investigations. (Tr. 143).

On August 27, 2013, Agent Cramsey received a phone call from a local criminal defense attorney who advised him that he had a client in his office that had an external hard drive which she believed stored images of child pornography. (Tr. 144). The defense attorney asked him to come to his office to look at the evidence and talk to his client. (Tr. 144). Agent Cramsey contacted Detective Meeks and asked him to meet at the defense attorney's office. (Tr. 145). Agent Cramsey met with Ms. Kaszynski and Ms. Nordean and interviewed them for approximately two and a half hours. (Tr. 146). Detective Meeks took the hard drive into custody and left, and Agent Cramsey stayed gathering information from Ms. Kaszynski. (Tr. 146).

After the August 27, 2014 meeting, Agent Cramsey called Ms. Kaszynski a few times in an attempt to clarify some information. (Tr. 146). At this time, Agent Cramsey was not completely sure that what Ms. Kaszynski was describing to him was child erotica or child pornography. (Tr. 146-147). For this reason he decided to meet with Ms. Kaszynski on September 3, 2013, with the external hard drive to see what was Ms. Kaszynski had seen. (Tr. 147).

On September 3, 2013, Agent Cramsey went to Chico's and met at Ms. Kaszynski's cubicle. (Tr. 148). Present at the desk were Agent Cramsey, Ms. Kaszynski, Ms. Nordean, Ms. Torock, Ms. Kaszynski's criminal attorney, Detective Meeks, and Chico's internet and loss security people. (Tr. 147-148). Agent Cramsey asked the women to do exactly what they had done before so that he could see the image that they had described. (Tr. 148). They brought up the external hard drive on the computer, so that the hard drive's root directory could be seen on screen. (Tr. 148). The women clicked on the same file that they had on August 27, 2013 and the image opened on the screen where he could see. (Tr. 148).

Agent Cramsey testified that once the external hard drive was turned on, he and Detective Meeks did not take control of the computer or utilize the mouse or keyboard. (Tr. 149).  Agent Cramsey testified that Detective Meeks assisted the women in getting the hard drive to work, as it had been previously damaged while it was stored in the evidence locker at Fort Myers Police Department. (Tr. 150).

Agent Cramsey testified that he was able to see the file names in the root drive very clearly. (Tr. 150).  His attention was drawn to the second column where he could see the acronym "PTHC" repeated approximately nine or ten times in file names. (Tr. 151).  He immediately recognized "PTHC" as a common acronym that's used in child pornography cases. (Tr. 151).  The acronym stands for "preteen hardcore," which is children 12 or 13 that are engaged in sexual activity. (Tr. 151).  Agent Cramsey testified that he took note of the file titles he saw in the root directory. (Tr. 151).

Agent Cramsey testified that Ms. Nordean operated the mouse and went to a particular file and opened the file, which is exactly what she had told Agent Cramsey they had done on August 27, 2013. (Tr. 153).  Agent Cramsey testified that the image that came onto the screen on September 3, 2013, was consistent with the description of the photograph the woman had given him on August 27, 2013. (Tr. 154).  Agent Cramsey testified that he considered the image to cross the line from child erotica and to be child pornography. (Tr. 157).

Afterwards, the hard drive was disconnected, packaged in a Fort Myers evidence bag, and Detective Meeks took custody of it.  Agent Cramsey prepared a search warrant which was signed by a United States Magistrate Judge on September 5, 2013. (Tr. 157-158).  Agent Cramsey testified that Detective Meeks performed a forensic analysis of the hard drive and found approximately 7000 images and 400 videos of child pornography. (Tr. 160).  Agent Cramsey

testified that the image he saw on September 3, 2013 was the file titled "IMG_9278.JPG" and not "IMG_9320.JPG". (Tr. 162).  Agent Cramsey explained that in "IMG_9278.JPG" the girl is holding her knees pulled up to her chest, which is what he recalled seeing on September 3, 2013 and is what the women described to him on August 27, 2013. (Tr. 162).

Agent Cramsey testified that he was interested in other devices from the very start of the investigation because the contents of the external hard drive could not be accessed without a computer. (Tr. 163).  In January 2014, after returning to Fort Myers from being on assignment elsewhere, Agent Cramsey took action to secure the eMachine Defendant had used. (Tr. 163). Agent Cramsey testified that the eMachine was located at Defendant's parents' home. (Tr. 163). On January 27, 2014, a search warrant was signed for the eMachine. (Tr. 167).  Agent Cramsey executed the warrant and gave Detective Meeks the eMachine to perform a computer forensic analysis. (Tr. 168).  The analysis found approximately 300 images and 18 videos of child pornography. (Tr. 168).  Agent Cramsey testified that he did not submit any copies of the alleged child pornographic photographs in the applications for the search warrants of the hard drive and eMachine. (Tr. 168).

On cross examination, Agent Cramsey testified that the probable cause to search the eMachine computer was based on the child pornography found on the external hard drive coupled with evidence showing that Defendant had ownership of the eMachine.

Agent Cramsey testified that the probable cause he relied on for the January 27, 2014 search warrant was the child pornography found on the external hard drive coupled with evidence showing the ownership of the drive.  (Tr. 169-170).  Agent Cramsey testified that the application for the search warrant provided that the file creation dates on the hard drive ranged from April

2008 to June 2012. (Tr. 170).  Agent Cramsey testified that the affidavit does not mention any evidence of Defendant's involvement with pornography after June 2012.  (Tr. 171).

Agent Cramsey testified that Detective Meeks helped plug in the hard drive because it was not working at first, but that he did not at any point control the mouse or keyboard. (Tr. 173). Agent Cramsey testified that Ms. Nordean's testimony that Detective Meeks had operated the computer's controls was inaccurate. (Tr. 173).  Agent Cramsey testified that the women made no mention to the acronym PTHC when he interviewed them on August 27, 2013. (Tr. 175).  Agent Cramsey testified that there is a pad or insert in the crotch area of the tights the girl is wearing in the image. (Tr. 178).  Agent Cramsey explained that the insert is why he described in the search warrant that the outline of the girl's vaginal and the anal area is visible. (Tr. 179).  Agent Cramsey testified that although the girl is wearing a top and tights, his description of the photograph in the search warrant applications were fair, accurate, and the truth. (Tr. 181).

On redirect examination, Agent Cramsey testified that the tights the girl was wearing in the photograph was not a piece of clothing a child would wear outside. (Tr. 184).  Agent Cramsey testified that although Defendant had been separated from his eMachine since August 2013, he still had reason to believe that the computer was utilized to access child pornography. (Tr. 185).

On recross examination, Agent Cramsey testified that it is not true that collectors of child pornography never choose to discard it. (Tr. 188).  Agent Cramsey testified that today there is less of a reason to not want to discard child pornography because it can be more easily re-acquired through the internet than in the past (Tr. 188).  Agent Cramsey testified that he was not familiar with the actual files on the hard drive, but only familiar with the acronym "PTHC". (190).

### E. Testimony of Alan Nelson

Alan Nelson testified as follows.  He has a bachelor's degree in Computer Information Systems from the University of South Florida and is currently employed by the Federal Public Defender's Office in the Middle District of Florida. (Tr. 191).  He has been employed with the Federal Public Defenders Office for approximately four years and three months. (Tr. 192).  His two main job duties entail system administration and computer forensics for cases involving computers. (Tr. 192).  He has taken numerous training courses in computer forensics and is certified in FTK, Forensic Tool Kit, a well-known forensic software. (Tr. 192).  He has been involved in approximately 50 to 75 cases. (Tr. 192).  He is familiar with every Windows operating system since Windows 2000 and XP. (Tr. 193).

Mr. Nelson testified that he reviewed a file list that was sent to him by Detective Meeks. (Tr. 193).  The file list showed the file names and paths, and also showed the dates the files were created and last accessed. (Tr. 193).  Mr. Nelson testified that an access date is a date that Windows sets on the file system when a file is accessed by Windows. (Tr. 193).  Mr. Nelson testified that on August 27, 2013, the system accessed five files and on September 3, 2013, ten files were accessed, including "IMG_9278.JPG" and "IMG_9320.JPG". (Tr. 195-196).  Also accessed on September 3, 2013 was a file entitled "Mya-BathWhite-GrowingUP-2.wmv". (Tr. 196).

Mr. Nelson testified that he disagreed with Det. Meek's testimony that a file's accessed date can change by hovering the mouse cursor over the file. (Tr. 197).  Mr. Nelson testified that he could not find any literature saying it is possible for a date accessed to change by hovering a mouse cursor over a file and in his experience that is not how last date accessed stamps change. (Tr. 197).  It is possible for a file's last date accessed stamp to change without opening the file,

but that would require that Windows preview feature be enabled. (Tr. 197-198).  Mr. Nelson testified that he attempted to change a file's last date accessed by hovering the cursor but could not get it to work. (Tr. 198).  He attached an external hard drive and tested whether the file's date accessed would change, but nothing happened. (Tr. 198).

On cross examination, Mr. Nelson testified that the only way a last date accessed stamp would change with a single mouse click would be if Windows preview feature was enabled. (Tr. 199).  Mr. Nelson testified that because the date last accessed stamp shows only the very last time the file was accessed, he could not tell if the files opened on September 3, 2013 had previously been opened on August 27, 2013. (Tr. 200).

On redirect examination, Mr. Nelson testified that besides a virus scan accessing a file, the only other way change the access date short of opening the file is to single click on the file when Windows preview is enabled. (Tr. 202).

### III.    Analysis

### a)   Whether the search of the hard drive on September 3, 2013, was unlawful

Defendant argues that the Government cannot establish the scope of the searches conducted on August 27, 2013 and September 3, 2013 and, thus, cannot rely on the private search doctrine to justify the warrantless search of the hard drive on September 3, 2013. (Doc. 32 p. 10-11).  The Government argues that Defendant abandoned the hard drive when he turned over control of the storage unit to Ms. Kaszynski. (Tr. 203).  Also, the Government argues that law enforcement did not exceed the scope of the private search and, thus, the search was legal. (Doc. 36 p. 10).

The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures. . ."  U.S. Const. amend. IV.

Searches conducted without a warrant are *per se* unreasonable under the Fourth Amendment—subject to only a few specifically delineated exceptions.  *Collidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971).  The Fourth Amendment, however,"proscrib[es] only governmental action; it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *United States v. Jacobsen*, 466 U.S. 109, 114 (1984).  Thus, even if a private individual independently examines an object that might have been impermissible if done by a government official, the search by the private individual is not unreasonable.  *Id*.  "A search by a private person does not implicate the Fourth Amendment unless he acts as an instrument or agent of the government." *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003).

A police officer may view or replicate a private search as long as the officer does not exceed the scope of the private review.  *See United States v. Durdley*, 2010 WL 916107, *6 (N.D. Fla. March 11, 2010). The Supreme Court has held that "additional invasions of [a person's] privacy by the Government agent must be tested by the degree to which they exceeded the scope of the private search." *Jacobsen*, 466 U.S. at 115.  When an officer views the same items that a private individual views to confirm the contents, this action on behalf of the officer does not violate the Fourth Amendment because "[p]rotecting against the risk of misdescription hardly advances any legitimate privacy interest." (internal quotation marks omitted),  *Jacobsen*, 466 U.S. at 119.  The Court must consider whether the officer obtained information from his search that could not have been learned from the private searcher's testimony, and if so whether the defendant had a legitimate expectation of privacy in this information.  *United States v. Runyan*, 275 F.3d 449, 461 (5th Cir. 2001) (citing *Jacobsen*, 466 U.S. at 118-120)).

As an initial matter, the Court rejects the Government's argument that Defendant abandoned the hard drive when he disassociated himself from the storage unit. "Whether abandonment occurred is a question of intent which may be inferred from acts, words and other objective facts." *United States v. Ramos*, 12 F.3d 1019, 1022-23 (11th Cir. 1994) (citations omitted). In this case, Defendant specifically requested that all hard drives be returned to him. Thus, the Government has failed to show that Defendant had the requisite intent to abandon the hard drive.

As to the search conducted by law enforcement on September 3, 2013, the Court finds that it did not exceed the scope of the private search that occurred on August 27, 2013. The testimony of the witnesses establishes that the first search of the hard drive occurred at Ms. Kaszynski's place of employment, Chico's. Ms. Kaszynski, Ms. Nordean, and Ms. Torock were present for the initial search. Ms. Kaszynski and Ms. Nordean testified that Ms. Nordean plugged the hard drive into Ms. Kaszynski's work computer and opened a window displaying the hard drive's root directory. The woman looked at the file names contained in the root directory and noticed that some had odd titles, such as "kitty kitty meow meow." The women selected a file that they believed to have an innocuous name and opened it. The file contained a photograph of a minor female wearing a bright neon yellow top with bright pink panty hose. The girl is holding her legs up to the top of her shoulders and the focal point of the image is the girl's vaginal and anal area. The panty hose the girl is wearing are sheer and the outline of the girl's vaginal and anal area were visible. After viewing this image, the women closed the window and disconnected the hard drive without looking at any other images.

The evidence further shows that on September 3, 2013, the women were asked by Agent Cramsey and Detective Meeks to recreate their previous search exactly as before. Detective

Meeks assisted in plugging in the hard drive into the computer.  Ms. Nordean opened the hard drive's root directory into a window.  She then guided the mouse to the same file she had opened on August 27, 2013.  She knew it was the same image based on its location in the root directory.  The photograph of the minor female displayed on the screen.  The woman testified that it was the same image they had previously seen.  Ms. Kaszynski, Ms. Nordean, Detective Meeks, and Agent Cramsey all testified that this was the only image opened on September 3, 2013.

The Court is unconvinced by Defendant's argument that the Government failed to establish the scope of the private search on August 27, 2013.  Although Defendant is correct that the women underestimated the number of files visible in the root directory and did not record the title of the file opened on August 27, these facts do not undermine the Court's finding that the Government established the scope of the private search.  The women's after-the-fact approximation that the root directory displayed approximately 40 files and folder, while substantially lower than what is actually on the root directory, is not so unreasonable as to undermine the women's testimony that they opened the same root directory on September 3, 2013, as they had on August 27, 2013.  The fact that the woman recognized the file named "kitty kitty meow meow" on September 3 further supports the women's testimony that the same root directory displayed during both searches.  Likewise, the Court finds that the Government established the exact image that was viewed on August 27 and September 3.  Both Ms. Kaszynski and Ms. Nordean testified that they saw "IMG_9278.JPG", the image showing the girl pull her knees to her chest, during both searches.  Defendant suggests that the women's testimony is inaccurate given the women's brief viewing of the image on August 27 and the fact that the same girl is depicted not only in "IMG_9278.JPG", but in "IMG_9320.JPG" as well.  The Court rejects this argument.  Although the images show the same girl, the girl's position is substantially

different in each image.   In "IMG_9230.JPG" the girl's legs are laid out straight.   In "IMG_9278.JPG", the girl is pulling her legs back towards her chest.   Agent Cramsey testified that when he first interviewed Ms. Kaszynski and Ms. Nordean they described a girl in a position in which she is laying on her back, pulling her knees to her chest, spreading her legs to expose her vaginal and anal area.   The description of the girl's pose is consistent with the description of the image file opened on September 3, "IMG_9278.JPG".   For these reasons, the Court finds that the Government established the scope of the private search performed by the women.

Furthermore, the Court is unconvinced by Defendant's argument that the "date accessed" records undermine the Government's establishment of the search performed by law enforcement on September 3.   The Court is confronted with the opposing views of the Government's witness, Detective Meeks, who testified that a file's "date accessed" stamp can be updated by hovering a cursor over a file, and Defendant's witness, Mr. Nelson, who testified that the only way a file's "date accessed" stamp can be updated is if a virus program scans the file or the file is clicked and its contents display in Windows preview.   Here, the Court need not determine which computer professional is correct on this point because the determinative issue is not which files were "accessed", but rather which images were actually viewed on August 27 and September 3.   On this point, all the witnesses who testified at the hearing consistently stated that only one image was opened and viewed on August 27 and September 3.   The Court finds Ms. Kaszynski, Ms. Nordean, Detective Meeks, and Agent Cramsey's testimony to this effect credible based on the consistency of their testimony on this point as well as on their demeanor in court.   The Court notes that Ms. Nordean's testimony did conflict with the testimony of Ms. Kaszynski, Detective Meeks, and Agent Cramsey in that she claimed Detective Meeks utilized the controls of Ms. Kaszynski's work computer during the September 3 search.   Based on the testimony of the other

witnesses, the Court finds that she is mistaken as to this point. In any event, Ms. Nordean testified that Detective Meeks never opened any files, but only examined the contents of the root directory. As the root directory was already viewed by the women on August 27, Detective Meeks did not exceed the scope of women's search by looking at the root directory.

Defendant asks the Court to follow the reasoning in three cases involving warrantless searches of electronically stored information: *Riley v. California*, 134 S.Ct. 2473 (2014); *United States v. Barth*, 26 F.Supp. 929 (W.D. Tex. 1998); and *United States v. Howe*, 2011 WL 2160472 (W.D. N.Y. 2011). The facts in these cases, however, are significantly different than the facts presented in the instant case. In *Barth* and *Howe*, law enforcement performed searches of computers that exceeded the scope of private searches. The courts in *Barth* and *Howe* rejected the view that a private search which uncovers a single contraband file opens the door for law enforcement to search the entire contents of a hard drive. Just as the Supreme Court did in *Riley*, the courts rejected the analogy that from *United States v. Runyan*, 275 F.3d 449, 464 (5th Cir. 2001), that a search of a hard drive is akin to a closed container search. The reasoning of these cases is irrelevant in this case. Here, the Court finds that the law enforcement search did not exceed the scope of the Ms. Kaszynski and Ms. Nordean's private search. Thus, the issue of how to treat the scenario presented in *Barth* and *Howe* is not before the Court.

In sum, the Court finds that law enforcement did not exceed the scope of August 27 search when they requested the women to recreate their search on September 3. Law enforcement's search on September 3 did not violate the Fourth Amendment, and thus, the search warrant for the hard drive was not the product of an unlawful search. Accordingly, the Court recommends that Defendant's motion to suppress be denied on these grounds.

### b) Whether the search warrants for the hard drive and eMachine computer were supported by probable cause

Defendant argues that even if the September 3 search was lawful, the resulting search warrants for the hard drive and eMachine computer were not supported by probable cause. (Doc. 32 p. 11).  Defendant argues that the allegations which are claimed to support probable cause are very limited. (Doc. 32 p. 12).  According to the Defendant, the description given in the affidavits of the one image viewed by the agents did not provide a basis to conclude that the image was child pornography.  Additionally, Defendant argues that there does not appear to be any probable cause for the search of the eMachine computer. (Doc. 32 p. 14).  Defendant argues that the only fact in the search warrant affidavit that would support the issuance of the warrant is that Defendant was in possession of the hard drive. (Doc. 32 p. 14).

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause . . ." U.S. Const. amend. IV.  Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence of a crime at a particular location. *United States v. Martinelli*, 454 F.3d 1300, 1307 (11th Cir. 2006).  An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause. *Illinois v. Gates*, 462 U.S. 213, 239 (1983).  A magistrate cannot rely upon wholly conclusory statements of others. *Id.*

In this case, the affidavit in support of a search warrant for the hard drive provides that the image opened on August 27 and September 3

> depict[s] a girl appearing to be an adolescent sitting on a chair of some sort holding her legs up in the air and provocatively displaying her genital area.  The girl is wearing pink see through tights but one can see the outline of her vagina as well as her anal area.  The image is clearly lewd and lascivious pose and the image focuses on her genital region making it sexually suggestive in nature.  The girl appears to be prepubescent or in the early stages of puberty and approximately 11-13 years old.

(Doc. 32-1 p. 15-16).  The Court finds that this allegation gives rise to probable cause that the hard drive contained child pornography.

Under 18 U.S.C. § 2252(a)(4)(B), for an image to constitute child pornography requires that the "visual depiction involve[] the use of minors engaging in sexually explicit conduct."  The definition of "sexually explicit conduct" is limited to "actual or simulated: (i) sexual intercourse . . .; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of the person." 18 U.S.C. 2256(a)(2)(A).  "Virtually all lower courts that have addressed the meaning of "lascivious exhibition" have embraced the widely followed *Dost* test, originally developed by a California district court and affirmed in an opinion by the Ninth Circuit." *United States v. Johnson*, 2011 WL 2446567, *5 (M.D. Fla. June 15, 2011) (quoting *United States v. Williams*, 444 F.3d 1286, 1299 n. 62 (11th Cir. 2006) (citing *United States v. Dost*, 636 F.Supp. 828, 832 (S.D. Cal. 1986), *aff'd*, *United States v. Wiegant*, 812 F.2d 1239 (9th Cir. 1987).  These factors are: "1) whether the focal point of the visual depiction is on the child's genitalia or pubic area; 2) whether the setting of the visual depiction is sexually suggestive, i.e. in a place or pose generally associated with sexual activity; 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; 4) whether the child is fully or partially clothed, or nude; 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; 6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer." *Johnson*, 2011 WL 2446567, at *5-6 (citing *United States v. Steen*, 634 F.3d 822, 826 (5th Cir. 2011) (citing *Dost*, 636 F.Supp. at 832)).

Here, an application of the *Dost* factors supports that there was reason to believe that the image described in the search warrant was child pornography.  First, the affidavit specifies that

the image focuses on the girl's genital area.  Second, the affidavit describes that the girl is in a sexually suggestive pose, with her legs pulled back exposing her genital area.  Third, this pose is not natural and her attire is not appropriate, as she is wearing see-through tights.  Fourth, the affidavit describes that the girl is wearing see-through tights, it also provides that the outline of her vagina and anal area is visible.  Based on an application of these factors, the Court finds that the description of the image contained in the affidavit gave rise to probable cause to believe that the hard drive contained child pornography.

The Court also notes that the affidavit for the hard drive was not based solely on a description of the picture.  Thus, even if the affidavit's description of the image alone did not give rise to probable cause, the Court would still find that probable cause supports the application of the search warrant.  The affidavit also specified that the affiant observed numerous file names on the hard drive that appeared to contain child pornography.  These included files such as "[PTHC] Liluplanet Masha 9yo Day 07" and "[PTHC] Liluplanet Masha Day 12 yo FULL with orgasm".  The affidavit explained that PTHC is a commonly used child pornography acronym meaning "PreTeenHardCore" and the reference "9 yo" and "12 yo" typically refers to the ages of the children depicted in the image or video.  Based on the usage of these acronyms in the file names, the Court finds that there is a fair probability of finding contraband or evidence of the crime of possessing child pornography on the hard drive.  Thus, probable cause supported the search warrant for the hard drive.

The Court further finds that probable cause supports the search warrant of the eMachine. In addition to the investigative details provided in the affidavit in support of the search warrant for the hard drive, the warrant for the eMachine computer also contained additional information that over seven thousand images and over four hundred videos depicting child pornography were

found on the defendant's external hard drive which had been searched pursuant to the search warrant authorized on September 5, 2013.  This information, combined with other facts in the affidavit in support of the search warrant alleging that Defendant spent much of his time at home on the eMachine to which he only had access, establish probable cause that child pornography was on Defendant's eMachine computer.  The search warrant issued for the eMachine computer was not the product of two unlawful searches of the hard drive.  The Court recommends that Defendant's motion to suppress be denied on these grounds.

**C) Whether the search warrant for the eMachine computer was stale**

Defendant argues that the allegations in the application for the search warrant of the eMachine were stale (Doc. 32 p. 15).  Defendant argues that the search warrant for the eMachine was not obtained for nearly five months from the time the search warrant was issued for the hard drive, and nearly 18 months from the time Defendant was alleged to have done anything besides continue to possess the eMachine. (Doc. 32 p. 15, Tr. 235).

The Government argues that the information provided in the affidavit in support of the search warrant for the eMachine was not stale. (Doc. 36 p. 12).  According to the Government, the massive amount of child pornography found on the hard drive substantiated that Defendant was a collector of child pornography.  For this reason, the Government argues that there was a fair probability that further evidence of child pornography would be found on the eMachine computer that defendant had purchased and had been using in the months prior to the execution of the search warrant. (Doc. 36 p. 12).

The staleness doctrine in the context of probable cause requires that the information supporting the government's application for a warrant must establish that probable cause exists at the time the warrant issues. *United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000).

"[T]raditional concepts of staleness that might apply to the issuance of search warrants for contraband or drugs do not mechanically apply to situations . . . where the object of the search is for images of child pornography stored on a computer." *United States v. Miller*, 450 F. Supp. 2d 1321, 1335 (M.D. Fla. 2006). When reviewing staleness challenges courts do not apply some talismanic rule which establishes arbitrary time limitations for presenting information to a magistrate, rather, each case should be reviewed on the unique facts presented. *Id.* (citing *U.S. v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)). In making a case by case determination the Court "may consider the maturity of the information, nature of the suspected crime . . . habits of the accused, character of the items sought, and nature and function of the premises sought to be searched. *Id.* When a defendant is suspected of possessing child pornography, the staleness determination is unique because it is well known that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes. *Id.* As the Eleventh Circuit noted,

> Because a lengthy delay can arise between the discovery of the evidence of child pornography possession and the execution of the search warrant, investigators and courts frequently rely upon an inference that the suspect is a collector of child pornography—and therefore is unlikely to dispose of his images—to establish that evidence of a crime will be present at some point in the future.

*United States v. Schwinn*, 376 F. App'x 974, 979 (11th Cir. 2010) (referencing *United States v. Lemon*, 590 F.3d 612, 614-15 (8th Cir. 2010)).

In this case, the Court finds that Defendant's arguments to the search warrant on staleness grounds are not warranted. The affidavit in support of the search warrant for the eMachine specified that the eMachine computer was exclusively used by Defendant up until his arrest on September 2, 2013 for violating an injunction order. Although Defendant did not have access to the eMachine after his incarceration, the Court still finds that there was probable cause to believe

that child pornography was stored on the eMachine's hard drive at the time the search warrant

was issued. Accordingly, the Court finds that the search warrant for the eMachine was not stale.

**IT IS RESPECTFULLY RECOMMENDED THAT:**

Defendant's Motion to Suppress (Doc. 32) be **DENIED**.

**Respectfully recommended** in Chambers in Fort Myers, Florida on September 25, 2014.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

**<u>NOTICE TO PARTIES</u>**

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a de novo determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02

Copies furnished to:

Counsel of Record
Unrepresented Parties